FRED W. JONES, Jr., Judge.
Plaintiffs, parents of a 16 year old boy who accidentally drowned while on an employer sponsored swimming party, filed suit against the employer and its workmen’s compensation insurance carrier for death benefits, penalties and attorney fees. Finding that the accident arose out of and occurred in the course of the decedent’s employment, the trial judge allowed recovery of funeral expenses. However, he concluded that plaintiffs had failed to prove that they were dependent upon their minor son and rejected the demand for those benefits. He also disallowed penalties and attorney fees.
Plaintiffs appealed the judgment, contending that the trial judge erred in denying their recovery of partial dependency benefits and in refusing to award penalties and attorney fees. Defendants answered the appeal, asserting that the lower court committed error in awarding funeral expenses based upon the finding that the accident arose out of and in the course of the minor’s employment.
For the reasons explicated in this opinion, we agree with appellees and reverse.
The Coordinating and Development Council of Northwest Louisiana (“Council”) is a consortium composed of ten northwest Louisiana parishes which operates a variety of state and federally funded projects. In 1978 the Council’s manpower program included a federally funded jobs project, under the Comprehensive Employment and Training Act, designed to provide summer employment for a nine-week period for economically disadvantaged youths residing in the ten parish area. Among those so employed was plaintiffs’ 16 year old son who, along with seven or eight other boys, was hired to cut grass and pick up litter in and around the small municipality of Rodessa, Louisiana.
The supervisor of the youth’s work crew was Carolyn Huseth, who had not worked *1341 for the Council before and was employed only for that particular summer program. Mrs. Huseth’s immediate superior was Mrs. Brenda Fay Jones, counselor for Caddo Parish with offices in Shreveport, who had minimal contact with the work crew in question.
As supervisor of the work crew Mrs. Hu-seth’s primary responsibilities were to assign specific jobs to the boys and to “teach good work habits.” Tools were furnished by the municipality of Rodessa, whose may- or suggested to Mrs. Huseth areas of the village where the grass needed cutting.
The boys worked four days each week, from Monday through Thursday, supposedly from 7 a. m. until 3 p. m. The established routine was for them to meet in the morning at the town hall, from which point Mrs. Huseth transported them in her pickup truck to the work area for that day.
Mrs. Huseth also kept a record on time sheets of the hours worked by the crew. She normally picked up these sheets on Monday morning and had each youngster sign his sheet. Then, on Wednesday Mrs. Huseth completed and turned in the sheets for the week, including credit thereupon for the eight hours the youngsters were supposed to work on Thursday. Although it was conceded that the boys seldom worked a full eight hour day, the only time that any of them did not receive credit on their time sheet for that eight hours was one day when five members of the crew were sent home for insubordination and received credit for only three hours.
The 1978 summer program was scheduled to terminate on Thursday, August 10. As was her custom, on Monday of that week Mrs. Huseth picked up the time sheets and had the boys sign them. She completed the sheets on Wednesday, giving to each crew member credit for eight hours of work on Thursday, the last day, and turned the sheets in.
During the first part of that week Mrs. Huseth had informed the youngsters that she would take them on Thursday to a pond located several miles out of Rodessa for a swimming party, apparently to celebrate the end of the program. There was no evidence that she had taken the boys on this kind of social outing before.
The record establishes that none of Mrs. Huseth’s superiors knew of or sanctioned the swimming party.
On that Thursday morning of the last work week the youngsters met Mrs. Huseth at the town hall at about 7:30 or 8:00 o’clock. They proceeded to an area in Rodessa near the home of Buehler, a municipal employee, where they “fiddled around” for one and one-half or two hours. When the time came for their “morning breaks” Mrs. Huseth informed the crew that it was time to go on their swimming party. She then took them to a grocery store where several purchased snacks for the party. Before the crew boarded Mrs. Huseth’s truck for the trip out to the pond, two members decided that they would not go and departed for their homes (it developed that they later changed their minds and went out to the pond, using their own transportation).
Shortly after the group arrived at the pond plaintiffs’ son accidentally drowned while wading.
The first critical issue posed by this appeal is whether the decedent’s accident arose out of and in the course of his employment with the Council.[1]
The trial judge, relying upon the reasoning of Whitney v. U. S. Fidelity & Guaranty Ins. Co., 373 So.2d 728 (La.App.2d Cir. 1979) found that the accident arose out of and in the course of the decedent’s employment because the “employer’s business seems to be almost as much furthered by this supervised activity as was sitting under the tree in front of Mr. Buehler’s house on some hot afternoon when they had completely run out of things to do.”
*1342 Kern v. Southport Mill, 174 La. 432, 141 So. 19 (1932) established the general rule that in workmen’s compensation cases the “arising out of” requirement involves an inquiry into the relationship of the accident to the necessities of the worker’s employment while “in course of” focuses upon the time and place relationship between the risk and the employment.
Most of the reported cases applying the Kern rule seem to have involved either unusual on-the-job occurrences, such as unexpected assaults, or questions of whether the employee had deviated from his regular job duties. On the other hand, there has been a dearth of Louisiana appellate court decisions addressing the issue of workmen’s compensation coverage of an employee injured or killed during an employer sponsored recreational or social activity.
In Whitney v. U. S. F & G Ins. Co., supra, the claimant was injured while on a quail hunt with his employer on a hunting lease in west Texas. The evidence established that the injured employee had been taken to the hunting lease by his employer to perform carpentry work and to familiarize himself with the lease in the event he was sent there with guests or customers of his employer. We concluded that at the time of the accident the claimant was not merely pursuing his own pleasure but “was engaged about his employer’s business.” Therefore, since the accident not only occurred in the course of employment but also arose out of that employment, recovery was allowed.
Obviously, Whitney is factually distinguishable from the case under consideration since plaintiffs’ minor son was clearly not engaged in his employer’s business at the time he drowned. Consequently, we must seek guidance from other sources.
In Larson’s Workmen’s Compensation (Desk Ed. 1977) Vol. 1A, Section 22, the following pertinent statement is found:
“Recreational or social activities are within the course of employment when
(1)They occur on the premises during a lunch or recreation period as a regular incident of the employment; or
(2) The employer, by expressly or impliedly requiring participation, or by making the activity part of the services of an employee, brings the activity within the orbit of the employment; or
(3) The employer derives substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale that is common to all kinds of recreation and social life.”
As pointed out in Section 22.23 of the same publication, relevant questions to be asked in determining workmen’s compensation coverage are:
“.. . Did the employer in fact sponsor the event? To what extent was attendance really voluntary? Was there some degree of encouragement to attend in such factors as taking a record of attendance, paying for the time spent, requiring the employee to work if he did not attend, or maintaining a known custom of attending? Did the employer finance the occasion to a substantial extent? Did the employees regard it as an employment benefit to which they were entitled as of right? Did the employer benefit from the event, not merely in a vague way through better morale and good will, but through such tangible advantages as having an opportunity to make speeches and awards?”
In Sica v. Retail Credit Co., 245 Md. 606, 227 A.2d 33 (1967), an employee was injured while swimming during a company sponsored annual picnic. Although attendance was entirely voluntary, all expenses of the picnic were paid by the employer. No business was transacted nor speeches made during the outing. However, it was determined that the annual picnic was an express term of claimant’s employment; that the employer encouraged and authorized formation of the picnic committee; that the employer paid all expenses of the picnic and deducted its outlay as a business expense for income tax purposes. The court found coverage because:
“On the undisputed evidence, taken as a whole, we find that the employer de *1343 rived substantial direct benefit from the activity beyond the intangible value of improvement in employee health and morale common to all kinds of recreation and social life.”
Another drowning during a company picnic was involved in Tietz v. Hastings Lumber Mart, Inc., 210 N.W.2d 236 (Minn.1978). The accident was held to have arisen out of and in the course of employment for the following reasons:
“The picnic was an annual outing sponsored and financed by the Hastings Lumber Mart, Inc. for the benefit of all of its full-time male employees. Full attendance was actively encouraged and actual attendance was usually close to 100 percent. The outing was held on a workday afternoon chosen in advance to provide as little conflict as possible with other obligations of the employees. Those who attended received a full days’ pay. Those who did not attend were not required to work as the business premises were closed at noon on the day of the outing. However, some wage adjustment was made for those not attending, either by a reduction in the employee’s sick leave or, in one case, by a direct docking of wages.”
Workmen’s compensation coverage was denied in Campbell v. Liberty Mutual Insurance Co., 378 S.W.2d 354 (Tex.Civ.App.1964) because the company sponsored outing on which decedent was drowned was entirely voluntary and the employees were not compensated while attending the function, even though its purpose was to promote good relations between employer and employees.
The court in Atkison v. Industrial Commission of Arizona, 26 Ariz.App. 6, 545 Pac.2d 968, also concluded that a drowning which occurred during a company picnic did not arise out of and in the course of employment. No wages were paid on the day of the picnic, the factory was closed that day, and attendance at the picnic was entirely optional. All food was paid for by the employer. Holding the critical element in the case to be “to what extent the deceased employee’s attendance was voluntary,” the court found no evidence of pressure by the employer for the employee to attend the picnic. Although there was testimony that the decedent stated that he felt compelled to be at the picnic in order to insure his job security, it was concluded that decedent’s “compulsion to attend the company picnic was purely on a subjective basis and not grounded on any actions of his employer.”
It is recognized that the unique nature of decedent’s largely “make-work” summer job presents us with a novel factual context within which to decide whether his accidental drowning arose out of and in the course of his employment. Adverting to the three Larson tests, supra, it is clear that the swimming party was not held on employment premises (which, though not a specific place, seemed primarily restricted to the limits of Rodessa). Furthermore, since the party occurred on the last work day of the program there was no evidence that the employer would derive any conceivable substantial direct benefit from the activity. The remaining question is whether, by expressly or impliedly requiring participation; or by making the activity part of the services of the decedent, the employer brought the swimming party within the orbit of the employment. In other words, was decedent’s attendance at the swimming party entirely voluntary?
Mrs. Huseth testified unequivocally that the boys were told they did not have to go on the swimming party. “I made it very clear that they didn’t have to go.” This was corroborated by the testimony of one of her sons, also a participant in the summer program, who said that his mother left it up to each individual as to whether he went to the pond. Another crew member, Robert Earl Hill, called as a witness for plaintiffs, was asked: “Didn’t she tell you that you could go if you wanted to, but you didn’t have to go?” He replied: “Yes, she told us.”
Two other crew members, who testified on behalf of plaintiffs, denied hearing Mrs. Huseth explain that attendance at the pic *1344 nic was voluntary. Neither, however, did they state that attendance was mandatory or in any way coerced.
The record does reveal that two of the youngsters did not choose to go out to the pond with the other boys on Mrs. Huseth’s truck. Obviously it must have been communicated to them that attendance was voluntary.
After considering the entire record, we conclude that all of the boys showed up at the appointed place on Thursday morning, the last day, expecting to work at least part of the day. Since they knew that their time sheets had been turned in, giving them credit for the full eight hours on Thursday, they expected to be paid for that entire day even though they only worked part of the day (as apparently happened frequently during the summer). Therefore, there was no reason for any of them to believe that they would be paid only if they attended the swimming party. That two youngsters chose not to go out to the pond with Mrs. Huseth is a significant factor indicating that the boys knew that attendance at the function to celebrate the end of the summer work program was entirely optional. As far as the boys were concerned, work for the last day was over when they went to the store for their “morning break”.
In summary, we find that the accidental drowning of plaintiffs’ son did not arise out of or in the course of his employment. Having made this determination, consideration of the other assignments of error is unnecessary.
For these reasons, we reverse the judgment of the trial court and render judgment in favor of defendants dismissing plaintiffs’ suit at their cost.

. La.R.S. 23:1031 provides in pertinent part:
“If an employee ... receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation ...”